Gary Lee DAVIS, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 92SC788.

Supreme Court of Colorado,
En Banc.

March 14, 1994.

Rehearing Denied May 2, 1994.

⚷641.13(7)

Dennis W. Hartley, P.C., Dennis W. Hartley, Colorado Springs, for petitioner.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Robert M. Petrusak, Asst. Atty. Gen., Crim. Enforcement Section, Denver, Steven L. Bernard, Sp. Asst. Atty. Gen., Brighton, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to determine whether the court of appeals in *People v. Davis*, 849 P.2d 857 (Colo.App.1992) (*Davis II* ), correctly upheld the trial court's ruling denying the defendant's Crim.P. 35(c) motion for post-conviction relief. Because we agree with the court of appeals that trial counsel for the defendant was an effective advocate, we affirm.

I

The defendant, Gary Lee Davis (Davis), and his now-divorced wife, Rebecca Fincham (Fincham), were prosecuted for the kidnapping, sexual assault and murder of Virginia May. The jury found Davis guilty of murder in the first degree,[1] felony murder,[2] conspiracy to commit murder in the first degree,[3] second degree kidnapping,[4] and conspiracy to commit second degree kidnapping.[5] Upon

---

**1.** § 18–3–102(1)(a), 8B C.R.S. (1986).

**2.** § 18–3–102(1)(b), 8B C.R.S. (1986).

**3.** §§ 18–2–201 & 18–3–102(1)(a), 8B C.R.S. (1986).

**4.** § 18–3–302(1), 8B C.R.S. (1986).

**5.** §§ 18–2–201 & 18–3–302(1), 8B C.R.S. (1986).

completion of the sentencing phase of the trial, the jury returned a death penalty verdict pursuant to the convictions. This court affirmed that verdict on appeal. *People v. Davis,* 794 P.2d 159, 213 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (*Davis I* ). Although Fincham was also convicted of murder in the first degree and several other felonies for her role in the killing, she received a life sentence. *People v. Fincham,* 799 P.2d 419 (Colo.App.1990), *cert. denied,* No. 90SC447 (Nov. 13, 1990). The facts underlying Davis' convictions are set forth fully in *Davis I.* 794 P.2d at 167–70.

After this court affirmed the judgments of conviction and death penalty sentence, Davis filed a motion for post-conviction relief under Crim.P. 35(c), and the trial court granted a stay of execution. Davis alleged that he was deprived of his constitutional right to effective assistance of counsel at the guilt and sentencing phases of the trial. At the Rule 35(c) hearing, trial counsel for Davis, Craig Truman (Truman), testified that in his opinion, his representation of Davis had been ineffective. The defense also presented an expert witness, Chief Trial Deputy in the Public Defender's Office Terri Brake (Brake), who testified that the performance rendered by Truman failed to satisfy the constitutional requirement that representation amount to reasonable, competent assistance. Brake based her opinion primarily on her view that Truman failed adequately to investigate potential mitigating factors, such as Davis' 1965 head injury, his alcoholism, his "passive-aggressive personality," and the positive statements some family members and friends may have made about Davis if called to testify.

Truman, an experienced defense attorney who previously had conducted 38 murder trials, including seven capital cases, explained that his strategy at the sentencing phase of the trial was to show that Fincham was equally, if not more, responsible for Virginia May's abduction and murder. He had hoped to persuade the jury that as a matter of equity, since Fincham received a life sentence, Davis should also be spared the death penalty. Truman further testified that when

Davis opted, against his advice, to take the stand and testify that he was more responsible for the murder of Virginia May than Fincham, he was not adequately prepared to present any alternative theories of mitigation.

The People contended, however, that Truman's strategy was justified in light of the overwhelming evidence of Davis' guilt. More importantly, in choosing to testify and implicate himself as the more culpable party, Davis contradicted his attorney's clear advice and forced Truman to pursue the trial strategy which Davis now contends was ineffective. In fact, Truman felt compelled to make a sealed record pursuant to *People v. Schultheis,* 638 P.2d 8 (Colo.1981), in which he explained how Davis had agreed with the facts and theory set forth in the opening statement yet chose to undercut that strategy by claiming that he, and not Fincham, was responsible for the murder. Truman also expressed his concern that his client's latest version of the events was untruthful and contrary to the physical evidence.

Applying the test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the trial court denied Davis' Crim.P. 35(c) motion based on its findings that Truman's performance did not fall below an objective standard of reasonableness and that Davis was not prejudiced by Truman's alleged ineffectiveness. The trial court specifically found that Truman's decision not to use certain potential character witnesses "was determined by trial counsel's opinion that they would do more harm than good.... The decision by [Davis] to testify at trial and to repudiate his prior story—more than the representation of [Truman]—led to the jury's decision to sentence [Davis] to death."

The court of appeals affirmed the trial court's ruling, holding that the representation provided by Davis' counsel did not constitute a violation of his right to effective assistance of counsel. *Davis II,* 849 P.2d at 863. It rejected Davis' claims that Truman was ineffective for his failure (1) to adequately investigate potential mitigating evidence; (2) to contact family and friends of Davis as potential character witnesses; (3) to explore

and present Davis' alcoholism as a mitigating factor; and (4) to investigate sufficiently a closed head injury suffered by Davis twenty-five years earlier. The court of appeals also held·that Truman did not abandon Davis during closing argument at the sentencing phase when Truman conceded that the crime was "inexcusable" and expressed his distaste for his client. Such comments constituted part of Truman's strategic decision to maintain his "candor and credibility" with the jury in the face of overwhelming evidence of his client's guilt. *Id.*

Davis does not now contend that Truman's performance at the guilt phase of the trial was constitutionally inadequate.[6] Rather, the sole question presented is whether Truman provided effective assistance during the *sentencing phase* of the trial.

## II

A defendant's right in a criminal proceeding to receive the reasonably effective assistance of an attorney acting as his diligent and conscientious advocate is guaranteed by the United States and Colorado Constitutions. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *People v. Norman,* 703 P.2d 1261, 1272 (Colo.1985). In order to obtain relief based on a claim of ineffectiveness of counsel, a defendant must satisfy the test adopted by the United States Supreme Court in *Strickland,* and followed by this court. *See, e.g., People v. Garcia,* 815 P.2d 937 (Colo.1991); *People v. Drake,* 785 P.2d 1257 (Colo.1990); *People v. Cole,* 775 P.2d 551 (Colo.1989).

Under the two-prong test of *Strickland,* a defendant must show, first, that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066. In determining whether trial counsel's performance was deficient, the relevant inquiry is whether counsel's representation fell

below an objective standard of reasonableness as informed by prevailing professional standards. *Id.* at 688, 104 S.Ct. at 2064–2065. This assessment requires that conduct be evaluated from counsel's perspective at the time the representation occurred, ignoring "the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065. Because of the difficulties of such an evaluation, the *Strickland* Court has directed courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

Mere error by counsel, even if professionally unreasonable, does not justify setting aside the judgment of a criminal proceeding if the error had no adverse impact on the defense. Thus, *Strickland* requires that the defendant also affirmatively prove that he was prejudiced by the deficient performance of counsel. *Id.* To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

Davis advances several arguments in support of his view that Truman's performance was both unreasonable and prejudicial to his defense. We will address each of these arguments in turn.

## A

Davis first contends that Truman's failure to investigate adequately prior to the sentencing phase potential mitigating evidence and, more specifically, his decision not to contact certain of Davis' family members, friends, employers, former counselors or

---

**6.** At oral argument before this court, Davis' appellate counsel conceded that trial counsel's performance *at the guilt phase* did not amount to ineffective assistance. Thus, we do not address

Davis' argument, rejected by the court of appeals, that Truman was ineffective for his failure to object to several errors allegedly committed during the guilt phase.

neighbors who may have been willing to testify as favorable character witnesses for Davis, amounted to ineffective assistance. We disagree.

■ A defendant is entitled to a pretrial investigation sufficient to reveal potential defenses and the facts relevant to guilt or penalty. *Norman,* 703 P.2d at 1272; *People v. White,* 182 Colo. 417, 422, 514 P.2d 69, 71 (1973). This is so because proper investigation of the case is essential for adequate representation. *Hutchinson v. People,* 742 P.2d 875, 881 (Colo.1987); *see Cole,* 775 P.2d at 555 (finding ineffective assistance where there was "virtually no investigation or preparation before trial").

■ Mere disagreement as to trial strategy, however, will not support a claim of ineffectiveness. *People v. Bossert,* 722 P.2d 998, 1010 (Colo.1986). As the United States Supreme Court stated in *Strickland:*

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690–91, 104 S.Ct. at 2066.

■ Furthermore, an attorney's decision not to interview certain witnesses and to rely on other sources of information, if made in the exercise of reasonable professional judgment, does not amount to ineffective assistance. *United States v. Glick,* 710 F.2d 639, 644 (10th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984). Whether to call a particular witness is a tactical decision, and, thus, a matter of discretion for trial counsel. *Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991); *Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987); *United States v. Miller,* 643 F.2d 713, 714 (10th Cir.1981). Consequently, when faced with overwhelming aggravating circumstances, trial counsel reasonably may conclude that the testimony of certain character witnesses would be of little help to the defense. *See Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070–2071. This is particularly true if such testimony would open the door to presentation of damaging evidence by the prosecution. *Burger v. Kemp,* 483 U.S. 776, 791–92, 107 S.Ct. 3114, 3124–25, 97 L.Ed.2d 638 (1987); *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986).

■ In the instant case, Truman testified at the Rule 35(c) hearing that his decision not to investigate whether certain friends and family could provide favorable character evidence was based upon his concern that such witnesses, if called, would be forced to admit highly prejudicial information about Davis on cross-examination. Truman referred to a memorandum prepared by William Martinez, an investigator for the deputy public defender who had originally represented Davis in this case, which was given to Truman upon his appointment as Davis' new counsel. In that document, Truman learned that those persons Martinez interviewed, who lived in the apartment house managed by Davis and Fincham, considered Davis to be extremely dishonest and prone to sexual misconduct. For example, neighbors who knew Davis indicated that Davis and Fincham "were ripping everybody off" and that Davis once told a former tenant that he wanted to sexually exploit a female neighbor after surreptitiously slipping her some drugs. Truman also learned that Davis' brother, Wayne Gehrer, described Davis as having a "devil-may-care" attitude and that the murder of Virginia May was the inevitable conclusion to Davis' life story. The Martinez memorandum also indicated that Davis' employer at the time of the murder thought that both Davis and Fincham had "a habit of telling half-truths to outright lies."

Truman further testified that although he did attempt to contact other potential character witnesses, "[m]any of the roads I looked into were not very helpful." In fact, prior to trial, Truman was aware that as a result of

Davis' prior incarceration for first degree sexual assault, his mother considered Davis to be no longer welcome in their home and an embarrassment to the family. Truman also knew that although Davis' ex-wife, Leona Coates, expressed some positive feelings about Davis, she also had revealed to the prosecution that Davis had at one time held a gun to her head during a disagreement over sexual matters. The testimony of such witnesses, if presented, would have constituted, in Truman's own words, "a two-edged sword" at best.

Truman also relied upon the opinion of an experienced forensic psychiatrist, Dr. Seymour Z. Sundell, in preparing Davis' defense. Truman asked Dr. Sundell to evaluate Davis and to give his professional opinion with respect to potential mitigating factors which could be presented at the penalty phase of Davis' trial.[7] After a four to five-hour consultation with Davis, Dr. Sundell reported to Truman that in his opinion, there was nothing he learned from the psychological evaluation or from Davis' history and background that would be helpful to Davis in mitigation.

In light of the above, Truman decided that the "main thrust" of his defense strategy would be the "equitable argument" that Fincham was at least as culpable as Davis and yet received only a life sentence. Truman specifically stated at the Rule 35(c) hearing his concern that the testimony of several potential character witnesses, such as Leona Coates, would have undermined this strategy by making it appear unlikely that Fincham had been the dominant figure in directing the murder. Truman therefore limited his presentation of character testimony at the sentencing phase to two relatively "safe" witnesses, Father Sunderland and Lt. Donald Allen, who described respectively Davis' remorse towards the May family and Davis' good behavior as a prison inmate, without opening the door to questioning on cross-examination into unfavorable areas of Davis' character.

The issue here is thus whether Truman acted reasonably, under prevailing standards, in deciding not to introduce additional char-

acter witnesses "out of apprehension that [such testimony] would contribute little to his client's chances of obtaining a life sentence while revealing possibly damaging details about his past and allowing foreseeably devastating cross-examination." *Burger*, 483 U.S. at 789 n. 7, 107 S.Ct. at 3124 n. 7. We conclude that Truman's decision was reasonable and well within the "wide range of professionally competent assistance" required under *Strickland.*

Truman's reliance, in part, on the investigation and evaluation performed by Martinez and Dr. Sundell was entirely appropriate under the circumstances, particularly where the information obtained from those sources corroborated what Truman already knew about his client, that is, that Davis' family, friends and associates often had as much negative as positive to say about him. *See Glick,* 710 F.2d at 644. As the *Strickland* Court noted, when there is overwhelming evidence of both guilt and aggravating factors, testimony that the defendant is a "good" person is unlikely to alter the outcome of a sentencing proceeding. 466 U.S. at 700, 104 S.Ct. at 2071; *Coleman v. Brown,* 802 F.2d 1227, 1235 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). Testimony that the defendant's immediate family considered him an embarrassment and that the grisly crime was an inevitable ending to Davis' life story, however, would be extremely prejudicial to the defense. *See DeLuna v. Lynaugh,* 873 F.2d 757, 758–59 (5th Cir.), *cert. denied,* 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989) (discussing potential devastating effect of character testimony that "backfires"). Therefore, Truman's strategic decision to forego investigation of potential character witnesses was supported by a reasonable professional judgment that such avenues would be more damaging than helpful. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2065–67; *Burger,* 483 U.S. at 791–92, 107 S.Ct. at 3124–25; *Darden,* 477 U.S. at 186, 106 S.Ct. at 2473; *Laws v. Armontrout,* 863 F.2d 1377, 1389 (8th Cir.1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989); *Foster v. Strickland,* 707 F.2d

---

7. Truman testified that he had no doubt at the time that Dr. Sundell understood "exactly what we lawyers were talking about when we talk about the word 'mitigation.'"

1339, 1345 n. 7 (11th Cir.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). Accordingly, we will not disturb the conclusion of the court of appeals that Truman was not ineffective in this regard.

## B

■ Davis next challenges Truman's failure to investigate adequately and to present evidence of Davis' alcoholism as a mitigating factor at the sentencing phase. Again, we agree with the trial court and the court of appeals that Truman acted reasonably as to this issue.

The crux of Davis' argument here is that Truman should have attempted to show, by way of expert testimony, that Davis fit the profile of a severe alcoholic and, as a result, could not have planned the kidnapping and murder. According to Davis, had Truman researched this issue among "the leading authorities on alcoholism," he would have discovered that Davis' alcohol problem, and particularly his claim to have suffered "blackouts" in his memory of the murder, constituted potentially mitigating evidence.[8] The question to be addressed under *Strickland*, however, is whether Truman's decision not to present Davis' alcoholism to the jury as a mitigating factor was a reasonable professional judgment. We conclude that it was.

At the Rule 35(c) hearing, Truman testified that he considered and rejected using Davis' alcoholism as a potential mitigator. Truman explained his decision by stating that in his experience as a criminal defense attorney, there was a likelihood that using the intoxication evidence in fact would have offended at least some members of the jury. He also noted the difficulty in general of proving a defendant's intoxication at the time the criminal conduct occurred. More specifically, Truman rejected use of Davis' alcoholism as a defense in this case, because (1) the sheriff's deputy who stopped Davis and Finc-

ham the evening of the crime concluded that there was no sign that either Davis or Fincham were intoxicated, despite the fact that, in Truman's opinion, the deputy "would have loved—would have done anything short of bending the facts to make an alcohol-related arrest on Gary Davis at the scene;" and (2) there were no chemical or physical tests performed to support a claim of intoxication, leaving only the self-serving testimony of Davis, "which was not very helpful." Finally, alcoholism was one of the issues examined by Dr. Sundell and found by him to be of no value as a mitigating factor in Davis' case.

The record leads us to conclude that Truman's decision not to present Davis' alcoholism as a mitigating factor was a reasonable tactical decision. Accordingly, there is no basis for a finding of ineffective assistance in this regard.

## C

■ Next, Davis argues that Truman was ineffective for his failure to investigate adequately and to present evidence regarding a closed head injury he suffered during an automobile accident in 1965. The record does not support this contention.

Davis claims that although he failed to inform Truman of this incident, Truman should have investigated his prior hospitalizations and discovered that the 1965 accident "caused his drinking to increase, blackouts to start and his criminal history to begin." This argument ignores the fact, however, that in 1964, one year prior to the accident, Davis' United States Navy Records indicate that he was diagnosed as having "homicidal tendencies." Moreover, Davis can point to no evidence which Truman would have uncovered from a more thorough investigation to support his theory that the slight concussion he received in that accident caused organic brain damage.[9] In fact, Dr.

---

8. It should be noted that Davis presented no expert testimony at the Rule 35(c) hearing to substantiate his claim that he had been suffering from the disease of "severe alcoholism" at the time of the crime. Rather, Davis merely submitted a transcript of trial testimony from a prior unrelated case in which an expert witness testi-

fied as to the common characteristics of severe alcoholism.

9. The only evidence presented at the Rule 35(c) hearing as to the possible mitigation potential of this distant closed head injury was Davis' own testimony that he and his first wife began to

Sundell specifically told Truman that he did not perceive any indication of organic brain syndrome during his evaluation of Davis.

Accordingly, we agree with the trial court's conclusion that Truman's failure to raise this issue at the sentencing phase did not amount to ineffective representation.

### D

Davis also contends that Truman was ineffective because he allegedly abandoned his client during closing argument at the sentencing phase. We disagree.

Truman began his closing argument at the sentencing phase with the following remarks:

> Now it's my turn to come and ask you for Gary Davis' life. That's what I'm here to do.... I'm moved by this case. It's going to take me a minute to talk to you. I didn't know what I was going to say to you. I couldn't sleep last night. Hell, I couldn't sleep for the last five. I don't think I was alone.

He proceeded to convey to the jury how on occasion he had felt hostility towards Davis for the crime he committed:

> There are times in this case that I hate Gary Davis, I am going to tell you that, and I think you know it. There are times I hate the things he has done, and I have told him, and I tell you, there's no excuse for it. There's no excuse for it whatsoever.

Truman then explained that Davis had little choice, from the outset of the case, but to seek the mercy of the jury:

> I can't recall a case where I have never made a closing argument, and I can't recall a case where we have spoken as little to you as we have this one, and there's a reason for it. That reason is that in December, when I first saw Gary Davis, I knew that sometime or other I was going to be standing here asking for 12 people's mercy. That's all he has got. That's all we can seek.

Truman also questioned the morality of the death penalty in general, arguing that to impose the death penalty on Davis for what

he has done would not provide any consolation to the victim's family:

> Like [the prosecutor] says, like Chaplain Sunderland, I couldn't be on this jury, because I, too, think killing is wrong, and it's killing, whether it's the state, and it's killing whether it's Gary Davis.... [I]f I thought that Brandon and Kristan May [the victim's children] would have five seconds of peace by Gary Davis' death, I would choke the life out of him right now, and he knows it, but it won't help. He's got a life sentence.... He's never, ever getting out, and he deserves never, ever to get out.

Truman then argued that despite his own anger at Davis for having lied to him, he strongly believed that Davis was no more culpable, and likely less culpable, than Fincham, who already received a life sentence:

> Some of the times I hate Gary Davis because of what he has done to me. I have been on this case since December, when the public defender got off. The public defender got off because of Gary Davis' lies, and Gary Davis has lied to me. Gary Davis set up the public defender for failure. In a lot respects he has set me up for failure. I guess I'm too prideful, worried about my reputation. Maybe that's why I hated him the other day.
>
> ....
>
> As bad as Gary Davis is—and you won't hear me say otherwise—there's someone equally as bad, maybe worse. That someone continues to lie. That's the someone who is so battered, when Gary Davis finally summons up a spark of conscience, and wants to tell the police, it's the battered, abused Rebecca Davis [Fincham] that says, "Don't tell 'em shit, we'll get a lawyer." ... And you saw [Davis] on the stand.... Anything to save Becky Davis [Fincham]. That demonstration alone, of watching him testify, I submit to you shows who's wearing the pants in this family. I'm not saying that forgives Gary Davis. Nothing forgives Gary Davis. He deserves to get what she [Fincham] got.... They're in the same position, I

"drift apart" at some point after the accident due

to Davis' increased use of alcohol.

submit to you, and I submit to you that both ought either to look at the gas chamber, or both spend the rest of their lives in the penitentiary.[10]

Truman concluded his statement with the following remarks:

> You can't change what's happened and I am not going to twist or fudge anything for you. Now's the time for me to be heard.... [E]ach one of you has it in your hand to spare Gary Davis or to kill him, for if one of you says no, stop the killing, there's been too much, that's the way it will be.
>
> Is there a man so bad that he's irredeemable? That's the question here. There's no question about what happened. It's a question about what's going to happen. I have never begged a jury before for anything, but I'm begging you now, and I am asking you please not to kill Gary Davis.

Although Truman's choice of words was flamboyant and perhaps overdramatic at times, his closing statement, taken as a whole, conveyed several important messages to the jury about his client. First, Truman made it clear from the outset that he was asking for the mercy of the jury in the face of overwhelming aggravating evidence against his client. Rather than attempting to "argue the absurd," Truman reasonably conceded the obvious strength of the prosecution's case and focused instead on the fact that Davis' life was in the hands of those twelve jurors. *See, e.g., Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir.1989), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990) (counsel's decision not to burden jury with the obvious nor to argue the absurd held reasonable); *Coleman,* 802 F.2d at 1236 (not violative of *Strickland* to limit closing argument to an appeal to jury's merciful instincts).

Second, Truman made a strong plea to the jury to consider the moral justification for imposing the death penalty in this case. Such an appeal to the jurors' moral and religious beliefs is a common defense tactic and one that highlights the "awesome responsibility" of determining whether death is the appropriate sentence. *See Caldwell v. Mississippi,* 472 U.S. 320, 337, 105 S.Ct. 2633, 2643–44, 86 L.Ed.2d 231 (1985); *Coleman,* 802 F.2d at 1236.

Third, Truman continued to present his "equitable" theory that Fincham was more culpable, even after Davis had contradicted its premise in his trial testimony and in his statement to the jury at the sentencing phase.[11] Truman explained that Davis' attempt to shoulder the blame for the murder was just another example of how Fincham manipulated and controlled Davis. Truman's portrayal of his client as untruthful was an integral part of this strategy, showing the extent to which Davis would say and do whatever Fincham requested.

Fourth, Truman stated that he was not going to "twist or fudge anything," thereby attempting to maintain his credibility and candor with the jury. We cannot fault Truman's efforts in this regard. *See, e.g., People v. Wade,* 44 Cal.3d 975, 244 Cal.Rptr. 905, 912, 750 P.2d 794, 801 (Cal.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

Furthermore, we decline to accept Davis' invitation to second-guess Truman's strategy at closing argument where such strategy was largely compelled by Davis' own decision, contrary to Truman's sound advice, to take the stand and testify that he (Davis), and not Fincham, was solely responsible for the murder. *See Romero,* 884 F.2d at 877 (refusing to fault defense counsel for use of dramatic ploy at closing argument where client confessed to participation in brutal rape and murder); *Foster,* 707 F.2d at 1343–44 ("Peti-

---

10. Immediately prior to closing argument, and in response to Truman's motion before the jury, the trial court took judicial notice of the fact that the district attorney did not seek the death penalty for Fincham.

11. During the guilt phase of the trial, Davis took the stand against Truman's advice and testified, on cross-examination, that he had raped the vic-

tim and that he was the one who fired all fourteen bullets into her body. In his statement before the jury at the sentencing phase, Davis again emphasized that "I'm the guilty one. Becky was not guilty. She was not guilty of murdering Ginny May. The only thing Becky was guilty of was marrying me."

tioner, who preempted his attorney's strategy choice, cannot now claim as erroneous the very defense he demanded [his counsel] present."). When a defendant chooses to take the stand, his testimony "gives the jury an immediate and visible impression of him as a person, which may color their view of the entire case against him." *People v. Curtis*, 681 P.2d 504, 513 (Colo.1984). The potential adverse consequences of testifying, which the defendant must accept as part of his *Curtis* decision, *id.* at 513–14, include any restrictions which such testimony may place upon the strategies available to his or her counsel in presenting the defense.

Truman's remarks to the jury about his exasperation with how Davis had "set [him] up for failure" reflect the difficult situation in which he and his client found themselves upon completion of the prosecution's closing remarks. The prosecutor had presented evidence of six aggravating factors, including Davis' prior felony conviction for sexual assault, each of which could serve as the basis for a sentence of death. As Davis freely admitted at the Rule 35(c) hearing,[12] one of the principal reasons why Truman felt compelled at closing argument to admit his distaste and occasional "hatred" for his client was Davis' decision to testify both at trial and at the sentencing hearing that he was solely responsible for the grisly crime. As we noted above, that testimony contradicted Truman's opening statement and the agreed-upon theory of the defense, leaving Truman little option but to portray Davis as a person compelled to be untruthful by his manipulative ex-wife.

Thus, Truman presented several reasonable arguments to the jury as to why Davis' life should be spared, and we refuse to fault him, in hindsight, for not presenting even

more. *See Coleman*, 802 F.2d at 1235–36 (rejecting argument that counsel should also have attempted to "humanize" his client at closing argument). In view of the limited options available to Truman after Davis testified, we are convinced that Truman's summation was the product of sound trial strategy. Accordingly, Truman's representation at this stage of the proceedings fell within the range of professionally competent assistance required by *Strickland*.[13]

E

Finally, Davis contends that Truman was ineffective in his failure properly to raise certain arguments about the death penalty procedure or to object to certain alleged errors committed during the penalty phase. We find no merit in this contention.

As the court of appeals correctly noted, this court has already addressed·and rejected Davis' claims as to the proportionality of the sentence and the doubling of aggravating factors. *See Davis I*, 794 P.2d at 173–74, 188–89. Davis now argues, however, that those claims failed on direct appeal because Truman did not investigate them adequately. Our opinion makes it clear, however, that even if Truman had spent considerably more energy pursuing those claims, such efforts would have been wasted. Neither claim raises a legally significant challenge to the Colorado death penalty procedure at issue. *Id.*

Davis also contends that Truman should have objected to several counts submitted to the jury at the sentencing phase and to an instruction that felony murder and murder after deliberation were two separate crimes, rather than alternative methods of committing a single crime.

---

12. When asked at the Rule 35(c) hearing whether he thought that Truman "had a chance to save [his] life before this jury," Davis testified that "I think he would have if I would have cooperated with him." This testimony is consistent with a letter in the record from Davis to Truman after the trial in which Davis stated that "you might have been able to do more if you hadn't had such a stubborn subject."

13. Even if we were to reach the separate question of whether Davis was prejudiced by Truman's closing remarks, Davis provides no evidence to support his burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Indeed, such a burden would be particularly difficult to meet in this case, where Davis opted to testify to the jury that he was solely responsible for the murder. *See Curtis*, 681 P.2d at 513 (discussing the profound impact on a jury of hearing the defendant speak for him or herself).

We need not decide, however, whether Truman's failure to object to these specific issues amounted to constitutionally deficient assistance, because Davis has not met his burden of showing that he was prejudiced thereby. The mere assertion of error is insufficient under *Strickland*, and Davis has failed to provide any basis for concluding that had Truman objected to those alleged errors, Davis would not have been sentenced to death.

### III

In summary, we reject Davis' several claims that he was deprived of his constitutional right to effective assistance of counsel at the sentencing phase of his trial. Testimony adduced at Davis' Rule 35(c) hearing substantially supports the trial court's findings that Truman's representation was both reasonable and competent and that Davis was not prejudiced by any alleged deficiency. Accordingly, we affirm the judgment of the court of appeals.

LOHR, J., specially concurs.

Justice LOHR specially concurring:

The majority rejects the claim asserted by the defendant, Gary Lee Davis, in a Crim.P. 35(c) motion that he was deprived of his constitutional right to effective assistance of counsel at the sentencing phase of his trial for first degree murder, which resulted in a sentence of death. *See* maj. op. at 779. It does so based on the conclusion that his representation by defense counsel, Craig Truman, "fell within the range of professionally competent assistance required by [*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]." Maj. op. at 778. I would reach the same result but would predicate it upon the failure of Davis to show that the alleged ineffectiveness of his counsel prejudiced his defense.

### I.

The right to effective assistance of counsel is guaranteed by both the United States and Colorado Constitutions. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "Thus, a defendant in a criminal proceeding is entitled to receive the reasonably effective assistance of an attorney acting as his diligent and conscientious advocate." *People v. Norman*, 703 P.2d 1261, 1272 (Colo.1985) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In *Strickland*, the United States Supreme Court articulated a two pronged test to be applied when reviewing an ineffective assistance claim. *See Norman*, 703 P.2d at 1272 n. 11 (adopting *Strickland*). In order to establish that he has been denied this constitutional right, the defendant first must show that counsel's performance was deficient—that is, that it was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. *See People v. Naranjo*, 840 P.2d 319, 324 (Colo.1992) (counsel's performance deficient if below the objective standard of reasonableness demanded of attorneys in criminal cases). Second, the defendant must show that the deficient performance prejudiced the defense by depriving the defendant of a fair trial, "a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *see People v. Oliver*, 745 P.2d 222, 228 (Colo.1987); *Norman*, 703 P.2d at 1272.[1]

A court may address the two components in either order, and if it is found that the defendant has not established one prong it is unnecessary to address the other. *Strickland*, 466 at U.S. at 697, 104 S.Ct. at 2069; *see People v. Garcia*, 815 P.2d 937, 941 (Colo. 1991).

### II.

Davis moved under Crim.P. 35(c) to vacate his death sentence and impose a sentence of

---

1. Each prong of the *Strickland* test presents a mixed question of fact and law. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *see also People v. Garcia*, 815 P.2d 937, 943 (Colo.1991). Therefore, a trial court's conclusion that counsel rendered effective assistance is not a finding of fact binding upon the appellate court. *See Kimmel-* *man v. Morrison*, 477 U.S. 365, 388, 106 S.Ct. 2574, 2590, 91 L.Ed.2d 305 (1986) (both components are mixed questions of fact and law and therefore a state court's ultimate conclusions regarding competence and prejudice are not findings of fact binding on the federal court).

life imprisonment on the basis that he received ineffective assistance of counsel at the penalty phase of his trial.[2] A hearing on the issue was held, and in addition to his own testimony, the defendant presented the testimony of two expert witnesses: his own trial counsel, Craig Truman, and Terri Brake, the Chief Trial Deputy in the Public Defender's Office. Both Truman and Brake have extensive experience in defending death penalty cases.

Truman stated that he realized before trial that this case was a "life or death case," which at some point would likely proceed to a penalty phase. He testified that, in spite of this knowledge, he did not adequately investigate possible mitigating factors in the defendant's background. Instead, his strategy, based on information supplied by his client, and as reflected by his opening statement to the jury, was to portray Rebecca Fincham, the defendant's wife and co-offender, as equally or more culpable than the defendant. Truman wished to persuade the jury that because Rebecca Fincham received a life sentence, the defendant's sentence should be no more severe. Once the defendant, contrary to the advice of counsel, testified during the guilt phase of the trial, changed his story, and accepted full responsibility for the death of the victim, minimizing the involvement of his wife in the killing, Truman was "unprepared to go forward with regular mitigation." Record, v. VIII at 25. Truman stated it was his belief that this failure to anticipate and prepare for the defendant's decision to testify and assume the role of principally culpable actor fell below the standard of competence for attorneys in Colorado.

Brake also testified that the representation was deficient. Based upon her more than fourteen years experience as a trial attorney and her current position as Chief Trial Deputy in the Public Defender's Office with litigation duties limited to death penalty cases, she testified that the representation provided by defense counsel fell below the applicable standard of competence. In her opinion, gathering a complete social history and thoroughly investigating possible mitigating evidence is necessary immediately upon learning that one is defending a case in which the prosecution is seeking the death penalty. According to Brake, an attorney cannot make informed strategic or tactical decisions without such information. She testified that it is "critical" to gather mitigation evidence prior to trial in order to be adequately prepared for jury selection.

> And this is not just standard practice but it's really required if you're going to determine if this person is qualified to sit or unqualified to sit, because you get people who cannot consider categorically, for example, certain types of mitigation evidence or certain types of aggravation evidence.

Record, v. VIII at 124.

In Brake's opinion, this essential investigation was never done. Some pretrial investigation for possible mitigating evidence was conducted, but the search was essentially unsuccessful. According to Brake, the investigation was incomplete and lacked the thoroughness required by local standards governing attorney performance in cases of this kind.[3]

As a result, Brake testified, jury selection was not the only portion of trial adversely affected. When the defendant insisted on testifying at the guilt phase and changed his story, defense counsel's line of defense was suddenly severely impaired. Because of the deficiency in preliminary investigation, not only did counsel have no alternative strategy available, but he did not have any mitigation evidence with which to "humanize" the defendant during the penalty phase.

The prosecution vigorously cross-examined these experts but presented no witnesses. Notwithstanding the absence of evidence contradicting the standard asserted by Brake, the trial court found representation

---

**2.** As the majority notes, the issue before us does not include effectiveness of assistance at the guilt phase of trial. *See* maj. op. at 772 n. 6.

**3.** As further evidence of trial counsel's inadequate representation, Brake cited trial counsel's failure to investigate the validity of the defendant's prior convictions, his inaccurate advice regarding whether attorney/client privilege was waived when the defendant made inconsistent statements during testimony at trial, his personal problems with the defendant, and what she termed his "abandonment" of the defendant at closing argument.

effective. *Strickland* suggests it is proper for a court to use its own legal knowledge to evaluate effectiveness, and the majority opinion in this case appears to do the same. *See also Naranjo*, 840 P.2d 319; *People v. Cole*, 775 P.2d 551 (Colo.1989); *Norman* 703 P.2d 1261. However, in light of the unrebutted expert testimony concerning the inadequacy of defense counsel's performance in this case, I find the issue of ineffectiveness of counsel close and difficult and would elect not to resolve the case on this basis.

### III.

"In resolving an ineffective-assistance claim, a court is not required to first determine whether counsel's performance was constitutionally deficient, for if the defendant fails to make an affirmative demonstration of prejudice, then the court may resolve the claim on that basis alone." *Garcia*, 815 P.2d at 941. The limited investigation conducted showed that most potential defense witnesses would likely offer damaging testimony in addition to anything positive, or would at least be subject to damaging cross-examination. As the trial court found, "No showing has been made as to anything Mr. Davis' family could have said which would have influenced the decision of the jury."[4] Record, v. I at

238. Considering this and the devastating effect of the defendant's decision to testify at trial, the trial court found that the defendant was not prejudiced by any alleged ineffectiveness of counsel.

Because prejudice presents a mixed question of fact and law, we are not wholly bound by the trial court's finding. *See supra* note 1. Nevertheless, "the trial court is in the best position to evaluate the evidence and the credibility of witnesses with regard to this portion of the *Strickland* test." *People v. Pozo*, 746 P.2d 523, 529 (Colo.1987). For this reason, we should give its findings on prejudice especially attentive consideration. Considering the trial court's findings and all of the evidence presented against the defendant,[5] along with the weakness of the potential character witnesses' testimony, I agree that the defendant did not meet his burden of demonstrating prejudice.

Accordingly, I concur in the judgment of the majority that the trial court properly denied the defendant's Crim.P. 35(c) motion to set aside the death penalty imposed in this case.

---

4. The record demonstrates that the testimony of family, neighbors and friends of the defendant would have been of limited persuasive value. Truman testified that after the defendant's first incarceration, the defendant's mother had indicated that he was no longer welcome at her home. One of the defendant's ex-wives, who still had positive feelings for the defendant, acknowledged that she had been physically abused during her relationship with him.

Investigator James Martinez from the Public Defender's Office, who was counsel for the defendant prior to Truman, had gathered some background information. Far from being helpful for mitigation purposes, the statements gathered were damaging to the defendant. Former tenants in the apartment building where the defendant lived and worked told an investigator from the Public Defender's Office that the defendant was a liar, and a "little strange and kinky." People's exhibit 6. The defendant's brother was also interviewed. He expressed the opinion that the murder was the inevitable conclusion to the defendant's life story.

5. As detailed in our original *Davis* decision, the crime itself was exceptionally brutal. *See People v. Davis*, 794 P.2d 159, 167–170 (Colo.1990), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112

L.Ed.2d 656 (1991). The jury found these aggravators:

(1) The murder was committed while the defendant was under sentence of imprisonment for a class-one, two, or three felony as defined by Colorado law.
(2) The murder was committed by intentionally killing a person kidnapped or being held hostage by the defendant or anyone associated with him.
(3) The murder was committed when the defendant was a party to an agreement to kill another person and in furtherance of which a person has been intentionally killed.
(4) In the course of or in furtherance of second degree kidnapping or immediate flight therefrom, the defendant intentionally caused the death of a person other than one of the participants.
(5) The murder was committed in an especially heinous, cruel or depraved manner.
(6) The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody.

It found that no mitigating circumstances existed.