23CA0729 Peo v Scott 04-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0729
Jefferson County District Court No. 15CR767
Honorable Christopher C. Zenisek, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Billy E. Scott,

Defendant-Appellant.

ORDER AFFIRMED

Division I
Opinion by JUDGE YUN
J. Jones and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 24, 2025

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

R. Scott Reisch, Alternate Defense Counsel, Robert F. LeVeen, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Billy E. Scott appeals the postconviction court's order denying his motion for relief under Crim. P. 35(c) after an evidentiary hearing.  Scott contends that his trial attorneys provided ineffective assistance by failing to (1) seek additional expert opinions on bullet ricochet; (2) produce testimony regarding his relationship with his former girlfriend and with the victim; and (3) object to the trial court's complicity instruction.  We reject each contention and affirm the order.

## I.    Background

¶ 2    The division of this court that considered Scott's direct appeal summarized the underlying facts as follows:

> [Scott] and his girlfriend, who worked together in the bail bond business, went to Troy Pitman's home to question him about a woman who had skipped bail.  Troy and his stepbrother, Larry, were in the garage; the garage door was open.  [Scott] walked into the garage and punched Troy in the face.  The two began fighting.  According to [Scott's] girlfriend's testimony at trial, when Troy began getting the upper hand in the fight, [Scott] told his girlfriend to shoot Troy with her gun.  The girlfriend pointed the gun toward Troy and Larry but did not shoot.  [Scott] then walked behind his girlfriend, wrapped his arms around her, put his finger on top of her finger on the trigger of the gun, and shot Troy, killing him.  Larry fled.

*People v. Scott*, slip op. at ¶ 2 (Colo. App. No. 16CA1553, Feb. 7, 2019) (not published pursuant to C.A.R. 35(e)) (*Scott I*).

¶ 3    A jury convicted Scott of one count of first degree murder after deliberation, one count of felony murder, one count of menacing with a deadly weapon, two counts of first degree burglary, and one count of second degree burglary.  The trial court sentenced Scott to life in prison for the murder convictions plus sixty years for the other convictions.

¶ 4    Scott appealed, and the *Scott I* division dismissed the appeal in part, affirmed it in part, vacated it in part, and remanded the case with directions.  The division dismissed Scott's appeal as to the complicity instruction due to waiver and remanded to the trial court to merge the burglary convictions, merge the felony murder conviction into the conviction for murder after deliberation, resentence Scott for first degree murder, and correct the mittimus. *Id.* at ¶ 29.

¶ 5    After the case was remanded to the trial court, Scott filed a motion for postconviction relief under Crim. P. 35(c) asserting multiple claims of ineffective assistance from his trial attorneys.  As relevant here, Scott argued that his trial attorneys provided

2

ineffective assistance by (1) not consulting with additional experts after a consulted expert did not agree with Scott's theory of a ricocheted bullet; (2) not presenting favorable evidence regarding Scott's relationships with both his associate/former girlfriend and the victim; and (3) not objecting to the jury instruction on complicity.

¶ 6    The postconviction court set the case for an evidentiary hearing, where it heard testimony from both of Scott's trial attorneys, an expert witness on the ricochet theory, one of Scott's friends, and Scott himself. The court denied postconviction relief, ruling that Scott failed to demonstrate both deficient performance and prejudice for each of his claims.

## II.    Standard of Review and Applicable Law

¶ 7    A postconviction court's ruling on a Rule 35(c) motion after a hearing presents a mixed question of fact and law. *People v. Sharp*, 2019 COA 133, ¶ 12. "We defer to the court's findings of fact if they have record support, but we review any legal conclusions de novo." *Id.* The postconviction court determines the weight and credibility to be given to the testimony of witnesses at a Rule 35(c) hearing. *People v. Hardin*, 2016 COA 175, ¶ 39.

¶ 8     "A criminal defendant is constitutionally entitled to effective assistance from his counsel." *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003). "[T]o prevail on an ineffective assistance of counsel claim, a defendant must prove that 1) counsel's performance was deficient and 2) the deficient performance prejudiced the defense." *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007). The failure to prove either of these two prongs defeats an ineffective assistance claim. *People v. Thompson*, 2020 COA 117, ¶ 50.

¶ 9     To establish deficient performance, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[J]udicial scrutiny of counsel's performance must be highly deferential, evaluate particular acts and omissions from counsel's perspective at the time, and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Ardolino*, 69 P.3d at 76.

¶ 10    To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,*

466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

### III. Failure to Seek Additional Expert Opinions on Ricochet

¶ 11 Scott first contends that his trial attorneys should have consulted additional experts about whether the bullet ricocheted after their initial expert told them he could not support the theory. We agree with the postconviction court that Scott failed to establish both deficient performance and prejudice under *Strickland*.

### A. Additional Background

¶ 12 From the start of the case, Scott maintained that he believed that the gun was not fired directly at the victim and that the victim was killed by a ricochet. He told his attorneys as much, and they retained a well-respected crime scene and ballistics expert, Jeff Saviano, to investigate this theory. The postconviction court found that one of Scott's attorneys

> asked Mr. Saviano about the possibility of a ricochet. She requested that he examine the gun and ensure it was operable; evaluate the gun's trigger pull and see if it was any lighter than normal; evaluate whether two adult fingers could fit in the trigger well; and review the crime scene in general. She did not recall whether she asked how the bullet might have become deformed, or why the copper jacketing

was found apart from the bullet. Mr. Saviano concluded that the bullet did not ricochet, following which [counsel] declined to endorse him. Consistent with her standard practice, she did not . . . seek a second expert opinion. Mr. Saviano, now deceased, was not available to testify at the post-conviction hearing.

¶ 13 Scott contended that his attorneys provided ineffective assistance by failing to seek additional expert opinions. To support this position, he provided expert testimony from a medicolegal death investigator who testified as an expert at the Rule 35(c) hearing that the evidence supported a ricochet theory.

¶ 14 The postconviction court denied Scott's claim. It noted that Scott's attorney "sought an opinion regarding the crime scene from a well-regarded expert" who "analyzed the scene and was not able to provide supportive testimony," and, "[f]aced with this information, counsel prepared for trial without him." The court found that, "[g]iven time limitations, monetary limitations and the demands of major trial work," the attorney's "decision not to seek a second opinion was objectively reasonable."

## B. Deficient Performance

¶ 15 We conclude that the postconviction court's findings under the first prong of *Strickland* — including its finding that it was

reasonable not to seek additional expert opinions — are supported by the record, and we will not disturb them.  *See Sharp*, ¶ 12.

¶ 16     First, the record demonstrates that Mr. Saviano was a well-regarded expert in ballistics and crime scene investigations. One of Scott's attorneys testified that Mr. Saviano was a respected, trustworthy, and credible expert who was "well-known in the defense community."  Indeed, Scott's expert at the Rule 35(c) hearing testified that he himself had received training from Mr. Saviano.

¶ 17     Second, the record demonstrates that Scott's attorneys did not perform deficiently in engaging with Mr. Saviano.  The attorney who consulted Mr. Saviano testified that she asked him

> to look at the gun that was used in this case to
> see whether it was operable.  It had been
> tested by the prosecution.  Also for him to
> evaluate trigger pull on the gun to see if it was
> lighter than normal.  And we also asked him to
> examine whether two adult fingers could fit
> within the space where the trigger was.  And
> we also asked him just to also review the crime
> scene in general.

Additionally, she asked him "if he could state as an expert that it was a ricochet."  To facilitate his review, the attorney provided Mr. Saviano with "access to the entire file.  He was able to see all of

the evidence that was collected by the prosecution, by the police, and then also he . . . physically and personally viewed the evidence in the case." To the extent that Scott suggests that his attorneys provided deficient performance by failing to consult a medical examiner about the victim's wound, he did not present any evidence or develop any argument suggesting that Mr. Saviano, an expert in ballistics, was unqualified to consider if the gunshot wound could support the theory that the bullet ricocheted before entry.

¶ 18 Third, the record supports the postconviction court's finding that it was reasonable not to consult with additional experts. Scott's attorney testified that her "practice was that we would engage one [expert] that we did respect, and we would not look for a second opinion." "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *People v. Newmiller*, 2014 COA 84, ¶ 46 (quoting *Strickland*, 466 U.S. at 690). After engaging a well-regarded expert and providing him with all available information, the attorney's decision to give up on a ricochet theory was strategic and adequately informed; thus, the presumption that it was reasonable is "virtually unchallengeable." *Id.*; *cf. Davis v.*

*Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.").

¶ 19 In light of these findings, we cannot conclude that Scott's trial attorneys' decision not to consult additional experts constituted constitutionally deficient performance.

## C.    Prejudice

¶ 20 We also agree with the People that Scott has not shown a reasonable likelihood that he was prejudiced by his trial attorneys' failure to consult with additional experts.

¶ 21 Testimony regarding a ricocheted bullet, which Scott claims would have advanced the theory that the gun was discharged accidentally, was only relevant to the charge for first degree murder after deliberation; it had no bearing on his felony murder conviction. As long as Scott entered the victim's garage uninvited with the intent to assault him, he committed burglary, which serves as a predicate felony for felony murder. *See People v. Medina*, 260 P.3d 42, 45 (Colo. App. 2010). The death of the victim during Scott's commission of the predicate felony is sufficient for the felony

murder conviction, regardless of whether the gun was accidentally discharged. *See Commonwealth v. Tejeda*, 41 N.E.3d 721, 724 n.4 (Mass. 2015) ("Felony-murder liability also extends to accidental deaths occurring during the course of an underlying felony so long as the death was a natural and probable consequence of the unlawful activity."); *Jefferson v. State*, 128 So. 2d 132, 136 (Fla. 1961) (the accidental discharge of the defendant's gun in the course of a robbery, resulting in the victim's death, constitutes felony murder). And because the murder convictions merged, Scott cannot show prejudice. In other words, regardless of what testimony defense counsel presented about a ricochet, Scott faced the same result because convictions for both murder after deliberation and felony murder — which merged into a single conviction — were class 1 felonies carrying the same life sentence.[1] *See* § 18-3-102(1)(a)-(b), C.R.S. 2016; § 18-1.3-401(1)(a)(V)(A), C.R.S. 2024.

---

[1] In 2021, the crime of felony murder was moved to the second degree murder statute, section 18-3-103, C.R.S. 2024, and reclassified as a class 2 felony. Ch. 58, secs. 1-2, 6, §§ 18-3-102, -103, 2021 Colo. Sess. Laws 235-36, 238. That change applies only to offenses committed on or after September 15, 2021. *Id.* at 238.

## IV. Failure to Present Testimony Regarding Scott's Relationships with His Former Girlfriend and the Victim

¶ 22 Next, Scott contends that his trial attorneys provided ineffective assistance because they failed to present testimony about (1) the nonromantic nature of his relationship with his former girlfriend and (2) his friendly relationship with the victim. We are not persuaded.

### A. Relationship with the Former Girlfriend

¶ 23 After the shooting, Scott's former girlfriend called the police to request medical assistance for the victim and told the dispatcher that she had fired the gun. When the police arrived, she again said that she was the person who had fired the gun. But at Scott's trial, the girlfriend testified that Scott had put his hands over hers on the gun and forced her to pull the trigger. She explained that she told the police that she was the shooter to protect Scott because she "cared about whether he got in trouble."

¶ 24 Scott contends that his trial attorneys provided deficient performance by failing to present evidence that he and the girlfriend were not, at the time of the incident, in a romantic relationship, which would have undercut the girlfriend's explanation for

11

changing her statements. We disagree. Like the postconviction court, we conclude that his attorneys' "lack of obsession with the issue was understandable and reasonable" because "[t]he trial evidence was uncontroverted that [Scott] and [the girlfriend] were business associates with at least some level of personal friendship" and, therefore, "regardless of the degree of frequency in their sexual intimacy, the jury was free to draw motive by [the girlfriend] to help [Scott] by accepting responsibility."

¶ 25      The record reflects that the trial attorneys made a strategic decision to characterize Scott's relationship with the former girlfriend as an "on-again, off-again" romantic relationship that was "more of a casual nature" and not a "serious, exclusive relationship." In support of this characterization, counsel elicited testimony from the girlfriend that she told a police officer that she and Scott "had been romantically involved in the past" but, as of the day of the shooting, they "were just friends."

¶ 26      Scott does not challenge this characterization. Instead, he argues that his attorneys should have presented additional defense witnesses to reinforce the fact that he and the girlfriend were not in a romantic relationship at the time of the shooting. But the

12

decision to call certain witnesses and what questions to ask those witnesses are matters of trial strategy, *Davis v. People*, 871 P.2d 769, 773 (Colo. 1994), and "[m]ere disagreement as to trial strategy will not support a claim for ineffective assistance of counsel," *People v. Bradley*, 25 P.3d 1271, 1275 (Colo. App. 2001). And "where it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *Newmiller*, ¶ 27 (alteration omitted) (quoting *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002)).

¶ 27 Accordingly, we agree with the postconviction court that Scott did not establish deficient performance under *Strickland* on this claim.

## B. Relationship with the Victim

¶ 28 Scott also contends that his trial attorneys provided deficient performance by failing to produce testimony that he and the victim were friends to dispute that he entered the victim's garage unlawfully. Failing to do so, according to Scott, effectively conceded the felony murder charge.

13

¶ 29     But Scott's attorneys testified — credibly, according to the postconviction court — at the Rule 35(c) hearing that "the fact that the two men were friends was not disputed at trial" and that it was not "viable to argue that [Scott] had entered the garage lawfully simply because the two men were friends." Instead, the attorneys elected to proceed on the theory that "Scott couldn't have possibly had any intent to harm the victim." *See* §§ 18-4-202(1), -203(1), C.R.S. 2024 (a person commits burglary by unlawfully entering a building or occupied structure "with intent to commit therein a crime").

¶ 30     The postconviction court concluded that this was a reasonable approach, noting that even if Scott and the victim had "been the best of friends, the relationship would not have yielded automatic permission to enter and confront at any time." We agree. Scott has not produced any evidence that his trial attorneys could have used to suggest that he had permission to enter the victim's garage at any time and for any reason, including to confront the victim over a bail bond that he and his fiancee cosigned. Accordingly, the attorneys did not provide deficient performance by electing to attack

the intent element of burglary (and, by proxy, felony murder) instead of challenging unlawful entry.

### V. Failure to Object to the Complicity Instruction

¶ 31    Lastly, Scott contends that his attorneys provided ineffective assistance by failing to object to the complicity instruction given at trial. We disagree.

#### A. *Childress* and the Complicity Instruction

¶ 32    Several months before Scott's trial, the Colorado Supreme Court held that a person can be found liable as a complicitor to a crime only if

> he aids, abets, advises, or encourages the other person in planning or committing that offense, and he does so with: (1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) *an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question.*

*People v. Childress*, 2015 CO 65M, ¶ 34 (emphasis added).

¶ 33    Based on this new decision, the trial court, with the parties' agreement, crafted a complicity instruction. The instruction provided in relevant part that for Scott

15

[t]o be found guilty as a complicitor, the prosecution must prove each of the following circumstances beyond a reasonable doubt:

1.   A crime must have been committed.

2.   Another person must have committed all, or part of, the crime.

3.   The defendant must have intentionally aided, abetted, advised, or encouraged the other person in planning or committing the crime.

4.   *The defendant must have had awareness of the circumstances attending the act or conduct that he sought to further, including the culpable mental state of the other person which is necessary to commit the crime.*

(Emphasis added.)

¶ 34   After the trial, the model complicity jury instructions were updated to reflect the decision in *Childress*. The current model instruction states, in relevant part, the following:

For the defendant to be guilty as a complicitor of the crime of [insert offense], as defined at the end of this Instruction, the prosecution must prove each of the following conditions beyond a reasonable doubt:

1.   Another person committed the crime of [insert offense], as defined at the end of this Instruction, and

16

2. the defendant, with the desire or the purpose or design to aid, abet, advise, or encourage the other person in planning or committing that crime,

3. aided, abetted, advised, or encouraged the other person in planning or committing that crime, and

[4. *the defendant was aware of all of the elements of that crime,* as defined at the end of this Instruction.]

COLJI-Crim. J:03 (2024) (brackets in original) (emphasis added).

### B. Analysis

¶ 35 Scott contends that his attorneys should have objected to the trial court's complicity instruction because "[t]here is a difference between having an awareness of the elements of the crime and intentionally aiding with the awareness that another was going to engage in all elements of a crime, including possessing the requisite mental state." Thus, Scott argues, "The instruction given at Scott's trial d[id] not clarify the necessity that Scott kn[e]w the different mental states required for each crime in which he was alleged to be complicit."

¶ 36 We agree with the postconviction court that Scott's attorneys did not perform deficiently by declining to object to the trial court's complicity instruction. The trial court's instruction included the

17

requirement that Scott "had awareness of the circumstances attending the act or conduct that he sought to further, including the culpable mental state of the other person which is necessary to commit the crime." This language was taken almost verbatim from the holding in *Childress* requiring "an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question." *Childress*, ¶ 34. Scott's attorney who was handling jury instructions reviewed *Childress* before electing not to object to the complicity instruction. *See Scott I*, ¶¶ 9-11. Given the similarity between the language used in the instruction and the language in *Childress*, we conclude that the attorney's decision fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

¶ 37 We are not persuaded otherwise by Scott's reference to the current model complicity instruction requiring that "the defendant was aware of all of the elements of" the principal's crime. COLJI-Crim. J:03 (2024). "In determining whether trial counsel's performance was deficient, a reviewing court must evaluate the representation 'from counsel's perspective at the time the

representation occurred, ignoring 'the distorting effects of hindsight.'" *People v. Lopez*, 2015 COA 45, ¶ 59 (quoting *Davis*, 871 P.2d at 772).  The new model complicity instruction did not exist at the time of Scott's trial, and the pre-*Childress* model complicity instructions effective at the time did not include the word "elements."  *See* COLJI-Crim. G1:06, :07 (2016).  Moreover, the supreme court did not draw a distinction between "an awareness of those circumstances attending the act or conduct" and an awareness of the elements of the principal's crime in *Childress*.  *Childress*, ¶ 29.  Rather, the court defined "circumstances attending the act or conduct" as "those elements of the offense describing the prohibited act itself and the circumstances surrounding its commission, including a required mental state, if any."  *Id.*

¶ 38    Without the benefit of an updated model jury instruction, the parties and the trial court had to determine how to instruct the jury on the concept of complicity as explained in *Childress*.  Scott's trial attorneys did not act below *Strickland*'s standard of reasonableness by failing to anticipate future changes in the model instructions, especially when the court's instruction included language directly from *Childress*.

¶ 39     Accordingly, we agree with the postconviction court that it was reasonable for Scott's attorneys to decline to object to the trial court's instruction, and, thus, Scott has not demonstrated deficient performance under *Strickland*.  Therefore, this ineffective assistance claim also fails.

## VI.    Abandoned Claims

¶ 40     In his opening brief, Scott also asserts that his trial attorneys provided ineffective assistance because they failed to (1) consult with a medical examiner to support his theory that he was struck from behind in the victim's garage;[2] (2) elicit information supporting the ricochet theory from a prosecution witness; and (3) call a witness who would have testified about Scott's state of mind the day of the shooting.  Although these three claims were included in

---

[2] The postconviction court did not make findings or rule on the claim that Scott's trial attorneys should have consulted a medical examiner about his injuries, but the record suggests this was an informed strategic decision.  One of Scott's trial attorneys testified that, regarding Scott's injuries, "[w]e did not insert it into the trial, and we didn't believe that it was an important piece of evidence.  We did have our investigator . . . go to the jail and document injuries of Mr. Scott. . . .  [W]e . . . did not believe, in viewing the photographs . . . , that his injuries were significant."

Scott's Rule 35(c) supplement, they were abandoned following the evidentiary hearing.

¶ 41 At the end of the hearing, the parties agreed to submit written closing arguments in the form of proposed findings of fact and conclusions of law. Noting that Scott's Rule 35(c) supplement included seventeen claims, "[d]epending on how you count them and break them apart," the postconviction court asked Scott's attorney to present the claims in a way that it could "consider everything but not be tasked with trying to resurrect a complicated record to try to find every needle that might be in a haystack of different arguments."

¶ 42 Scott's attorney submitted proposed findings of fact and conclusions of law that listed only the following claims:

> A. Scott's legal representation was constitutionally ineffective because it failed to present information to the jury about how the gunshot occurred and the likely path of the bullet that was consistent with Scott's statement of how the bullet was fired and not consistent with testimony at trial.
>
> B. Scott's legal representation was constitutionally ineffective because it failed to investigate and present evidence that Scott and [the girlfriend] were not lovers resulting in the jury not being aware of evidence that

21

contradicted the argument of the prosecution that [the girlfriend] lied when she stated she was the shooter to protect Scott.

C.    Scott's legal representation was constitutionally ineffective because it failed to investigate and present evidence of the relationship between Scott and Troy Pitman that would have established that their presence in Troy Pitman's garage was lawful, and they remained lawfully.

D.    Scott's legal representation was constitutionally ineffective because counsel failed to object to the complicity instruction.

E.    Scott's legal representation was constitutionally ineffective because counsel failed to follow up on a juror who was thought to be sleeping, even after the issue was addressed by the court.

The attorney did not include any analysis relating to the three claims now advanced on appeal. Consequently, the postconviction court ruled on only those claims identified in the proposed findings of fact and conclusions of law.

¶ 43    "Abandonment . . . typically arises from a party's decision not to pursue or reassert a claim that the party had raised previously." *People v. Smith*, 2024 CO 3, ¶ 18. Postconviction counsel serves as the "captain of the ship" and has final authority to choose which postconviction claims to pursue or abandon, even if the defendant

22

disagrees with that decision. *Id.* at ¶¶ 26, 30. We conclude that, by failing to identify or make any arguments regarding the three omitted claims in the proposed findings of fact and conclusions of law, Scott's postconviction attorney abandoned them. *See id.* at ¶¶ 18-22; *People v. Abeyta*, 923 P.2d 318, 321 (Colo. App. 1996) (Even though the defendant's attorney said it was not his intent to abandon claims, his "withdrawal of the claims from the court's consideration in the first hearing resulted in his abandonment of those claims."), *superseded by rule on other grounds as recognized in People v. Roy*, 252 P.3d 24, 27 (Colo. App. 2010); *cf. People v. Young*, 923 P.2d 145, 149 (Colo. App. 1995) ("[B]ecause he failed to request a ruling on this issue [from the postconviction court], defendant has waived it on appeal."). Accordingly, we do not consider these claims.

## VII.   Disposition

¶ 44    The postconviction court's order is affirmed.

JUDGE J. JONES and JUDGE BERGER concur.