United States Court of Appeals,

Eleventh Circuit.

No. 94-2872.

Allen Lee DAVIS, Petitioner-Appellant,

v.

Harry K. SINGLETARY, Jr., Secretary, Florida Department of Corrections, Respondent-Appellee.

Aug. 11, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-251-Civ-J-20), Harvey E. Schlesinger, Judge.

Before EDMONDSON, BIRCH and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Allen Lee Davis was convicted and sentenced to death in Florida for the brutal murders of Nancy Weiler, her ten-year-old daughter Kristina, and five-year-old daughter Katherine. The murders occurred in the Weiler home in Jacksonville, Florida, on May 11, 1982.

In denying Davis' petition for a writ of habeas corpus, 28 U.S.C. § 2254, the district court issued a detailed opinion thoroughly discussing the extensive procedural history of the case, the relevant facts, and the legal issues Davis raised in the district court. *See Davis v. Singletary,* 853 F.Supp. 1492 (M.D.Fla.1994). Because that opinion is published, except where necessary we will not repeat here what has been said there. Most of the issues Davis has raised before us on appeal from the district court's denial of habeas relief concern his death sentence, but some go to the validity of his murder convictions. We will first address those guilt stage issues.

## I. THE GUILT STAGE ISSUES

### A. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM RELATING TO THE INSANITY DEFENSE

Although he raised additional ones in the district court, 853 F.Supp. at 1509-10 n. 7, in this Court Davis presses only two guilt stage ineffective assistance of counsel issues.

The first such claim Davis presses here is that trial counsel was ineffective for failing to investigate and present an insanity defense. In support of that claim, Davis proffered to the district

court a report of Dr. Harry Krop, a licensed psychologist, who stated his opinion that Davis had been insane at the time of the offense in 1982. Dr. Krop's report was generated in 1986, which was three and one-half years after Davis was convicted. *See* 853 F.Supp. at 1543. Davis contends that the allegations of his complaint, backed up by Dr. Krop's report, at least entitled him to an evidentiary hearing on the issue.

However, we have held that a habeas petitioner is not entitled to an evidentiary hearing on a claim, even one supported by an affidavit, where the record conclusively establishes that he is not entitled to relief on that claim. *See Spaziano v. Singletary,* 36 F.3d 1028, 1037 (11th Cir.1994) (holding the district court had not erred in denying an evidentiary hearing, because "the record trumps the Schwarz affidavit and conclusively shows that this claim is without merit"); *see also Bolender v. Singletary,* 16 F.3d 1547, 1565 n. 25 (11th Cir.1994) (rejecting an affidavit that was inconsistent with what a review of the record revealed); *Stano v. Dugger,* 901 F.2d 898, 899 (11th Cir.1990) ("The petitioner will not be entitled to an evidentiary hearing when his claims are ...'contentions that in the face of the record are wholly incredible.' ") (quoting *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)). Here, the record of Davis' prior state court proceedings, including his trial, and the record of the three-day evidentiary hearing the district court held on related issues involving Davis' mental state, collectively refute this claim to such an extent that Davis is not entitled to an evidentiary hearing on it. *See, e.g.,* 853 F.Supp. at 1530-48.

Davis was originally represented by two assistant public defenders, who had to withdraw because of a conflict of interest. Experienced criminal defense attorney Frank Tassone was then appointed to represent Davis. During the course of a number of interviews, Davis, though uninvited to do so, told Tassone the details of the crime. When asked at the evidentiary hearing in the district court what Davis had told him about why he had picked the Weilers to rob, and what had happened once Davis was inside their home, Tassone testified:

> He noted that Mr. Weiler's—excuse me that Mr. Davis's mother and stepfather resided next door or within two houses of the Weiler home. He had noticed that Mr. Weiler traveled a lot, he didn't know what type of work he did.

2

> He noted that there were two children that were in the home with Mrs. Weiler. And I believe this occurred late in the afternoon. He entered the home, and prior he had taken a handgun that his stepfather had in the kitchen. He indicated that, I think, he surprised and confronted Mrs. Weiler and the children and attempted to engage them in some conversation. She essentially ordered Mr. Davis out of the house, at which point Mr. Davis—and I'm not too sure of the scenario, which occurred first, either hit Mrs. Weiler with the weapon. I remember him telling me that Mrs. Weiler told her children to run. And then he told me that, how one of the children was killed in the bedroom.

H.Tr. at 123-24. Tassone further testified that Davis had related to him how he killed one of the children:

> She was bound with her hands behind her back, that she was hit, I believe, in the head with the barrel of the gun, or the grips on the gun, and I believe she was then shot.
>
> ....
>
> I think there was substantial crying and screaming by the children. I can't remember if there was any other conversation.

*Id.* at 124. Davis told Tassone "the gory details of a rather grizzly homicide scene." *Id.* at 196-97.

He also told Tassone why he had committed the crime:

> When Mr. Davis first talked to me about that, he said something snapped after he got inside the house. In subsequent conversations he indicated that he felt that there were items in the house that could be taken. And I think that was from the nature of the neighborhood, that it was an upper middle class neighborhood.

*Id.* at 124-25. Davis described to attorney Tassone how he had disposed of the murder weapon, and what had happened to the Nikon camera he stole from the house. *See id.* at 125.

By the time Tassone entered the case, Davis' prior attorneys had arranged for him to be examined by Dr. Ernest Miller, a qualified forensic psychiatrist who had conducted thousands of forensic evaluations over the course of his career. 853 F.Supp. at 1547; H.Tr. at 251. They selected Dr. Miller because he was a leading expert in the area, and they respected his opinion. H.Tr. at 247-48.

After thoroughly interviewing, examining and testing Davis, once with the use of sodium Amytal, and conducting neurological screening and administering an electroencephalogram, Dr. Miller concluded that Davis had a normal I.Q., was competent to stand trial, "[c]ertainly he was not psychotic," H.Tr. at 253-270, and there was no insanity defense for him. *See* 853 F.Supp. at 1537-

3

38. Miller's diagnosis was that Davis was an antisocial personality, and that he also had a psychosexual disorder, pedophilia, which means that "children are the primary sexual object of Mr. Davis." H.Tr. at 272-73. The crime was not, in Dr. Miller's opinion, the product of insanity but instead was the product of Davis' desire for money; he had chosen the house he did because it looked like a good place to rob. H.Tr. at 265, 271.

Even after receiving the unequivocally negative report from Dr. Miller, Tassone persisted in his effort to build a mental state defense. He successfully moved the court to appoint a neurological expert, because he "wanted to make absolutely certain that there was no type of chronic or congenital brain damage or brain dysfunction that Mr. Davis was suffering from." H.Tr. at 150-51. As a result of Tassone's efforts, the court appointed Dr. Glenn Pohlman, a neurologist. After examining, testing, and questioning Davis in detail, Dr. Pohlman issued a written report finding that Davis was normal in all respects except for reduced hearing due to a large amount of ear wax. Otherwise, Dr. Pohlman found Davis had a "normal neurological examination, a normal neurological history and ... a normal electroencephalogram." 853 F.Supp. at 1537-38.

Even in the face of Dr. Miller's and Dr. Pohlman's reports, Tassone went further. "Out of an abundance of caution," he moved the court to appoint yet another expert, a psychologist or another psychiatrist to examine and evaluate Davis. That motion was denied. H.Tr. at 154. Tassone made that effort even though Davis had never said anything to indicate he was mentally impaired. H.Tr. at 128-131.

In spite of all Tassone did, Davis contends that he rendered ineffective assistance of counsel because he did not produce and utilize expert opinion testimony, such as that outlined in Dr. Krop's report. If given an evidentiary hearing, Davis argues he could prove Dr. Krop's opinion that Davis was insane at the time of the offense and thereby establish that attorney Tassone rendered ineffective assistance in this respect. No evidentiary hearing is necessary to demonstrate that this contention is meritless. First, we have held more than once that the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial

4

counsel was ineffective for failing to produce that expert at trial. *See, e.g., Horsley v. State of Alabama,* 45 F.3d 1486, 1495 (11th Cir.1995) ("That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987). Second, attorney Tassone's futile efforts to develop an insanity defense in this case exceed the efforts of attorneys in other cases where we have rejected ineffective assistance claims relating to insanity defense. *See, e.g., Bertolotti v. Dugger,* 883 F.2d 1503, 1509-15 (11th Cir.1989); *Stephens v. Kemp,* 846 F.2d 642, 652-53 (11th Cir.1988).

Third, and this goes to the prejudice component of the inquiry as well, Dr. Krop's opinion concerning Davis' mental state is based upon premises that are clearly false. For example, one of the premises Dr. Krop bases his opinion on is that Davis "is genuinely unable to recall the offense." Krop Rpt. at 9.[1] That is simply not true. It is undisputed Davis recounted the crime in detail to Tassone. Because of his ethical duty not to present a defense based upon what he personally knew to be a lie, Tassone could not have used at trial Dr. Krop's opinion, founded as it is on a falsehood. As Tassone testified, putting on expert testimony that depended on Davis' statements to the expert that he did not remember the crime "would have presented a major ethical problem should that have occurred, on my part." H.Tr. at 225. The duty to render effective assistance of counsel does not include the duty to present false or misleading testimony. *See Williams v. Kemp,* 846 F.2d 1276, 1281 (11th Cir.1988) ("In light of the admission by Williams, [his attorney's] decision not to produce contrary testimony merely fulfilled his ethical obligation to refrain from producing false or misleading evidence," and did not constitute ineffective assistance.).

Another false basis of Dr. Krop's opinion about Davis' mental state at the time of the crime is, in what Dr. Krop described as, "his lack of motive for committing such an offense." Krop Rpt. at 9. Davis did have a motive for the crime: he had been out of work for two weeks, and he needed

---

[1]We cite Dr. Krop's report, which is attached as Appendix A to Davis' habeas petition, as "Krop Rpt."

money. He picked the house he did because it looked like it would be easy to rob. H.Tr. at 124-25, 265, 271.

Dr. Krop also based his opinion upon the premise that, "such an act of violence is absolutely uncharacteristic of his personality," Krop Rpt. at 9-10, which is characterized by "his history of nonassertive behavior." Krop Rpt. at 9. Putting aside the fact that Davis had a history of child molestation—most people would think child molestation is assertive behavior—Davis previously had been convicted of "robbery, attempted robbery, and use of a firearm during commission of a felony." *Davis v. State,* 461 So.2d 67, 71 (Fla.1984). The armed robbery conviction was for holding up a victim making a night deposit at a bank. *See* H.Tr. at 124. The attempted armed robbery conviction resulted from Davis staking out a residence with plans to commit a robbery of the people who lived there; he had a revolver and stocking mask when caught before he could commit the crime. *See id.* at 124-25. Those convictions were in addition to the involuntary manslaughter conviction and fifteen-year sentence for which he was on parole at the time of this crime. *See id.* at 124. Moreover, on another occasion, which did not result in a conviction, Davis had robbed an oil company employee at gunpoint. *See id.* at 126. He had once destroyed some machinery at work in a fit of anger, and in an unrelated episode he had deliberately driven another motorist off the road. *See id.* at 85-86. Dr. Krop was either ignorant of the most salient facts about Davis' behavioral history, or he has a peculiar definition of "nonassertive behavior."

Even if Dr. Krop had been available at trial to testify as indicated in his affidavit, and putting aside for the moment the ethical obstacles to use of that testimony, Tassone would have been foolish to use Dr. Krop's testimony. As Tassone stated at the evidentiary hearing, "I'm not going to put on any testimony if I think in cross-examination that the state is going to slaughter that particular witness." H.Tr. at 211. It is readily apparent from what is in the record that the guilt stage

6

ineffective assistance claim based upon Tassone's failure to develop and present an insanity defense is utterly without merit. No additional evidentiary hearing is necessary to determine that.[2]

B. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM RELATING TO THE HYPNOTIZED WITNESS

The other guilt stage ineffective assistance claim that Davis presses on appeal concerns attorney Tassone's failure to attempt to exclude the testimony of a witness for the prosecution because she had been hypnotized to refresh her recollection, and his failure to attempt to impeach her testimony on that basis. After conducting an evidentiary hearing on this claim, the district court rejected it. *See* 853 F.Supp. at 1525-29.

As for Tassone not attempting to exclude the witness' testimony, the district court held that it was not professionally deficient for Tassone to fail to anticipate that the law in Florida would be changed in the future to bar the admission of hypnotically induced testimony. *See* 853 F.Supp. at 1526-28. Not only did the Florida Supreme Court decision altering the law in that regard come two full years after the trial of this case, but that decision was given prospective effect only. *See id.* at 1527-28. The correctness of the district court's holding on this issue is confirmed by our decision in *Spaziano*. Presented with materially identical facts, we reached the same holding there the district court did here. *See Spaziano,* 36 F.3d at 1038-39.

As for Tassone's failure to attempt to impeach the witness' testimony because she had been hypnotized, Tassone testified that if he had attempted to present evidence about the dangers of hypnotically induced testimony, he would have lost the right to open and close arguments to the jury. *See* 853 F.Supp. at 1527. An attorney who testified as an expert witness for Davis at the

---

[2]Davis and his present counsel complain that the district court misread the part of his petition involving this claim as being a mere introduction to other claims. To a large extent, that is their fault, because they filed a 313-page petition that is far from a model of clarity. As we have warned before, "Attorneys who cannot discipline themselves to write concisely are not effective advocates, and they do a disservice not only to the courts but also to their clients." *Spaziano,* 36 F.3d at 1031 n. 2. Moreover, if the district court misinterpreted this claim, Davis and present counsel should have pointed that out in the nineteen-page motion to alter or amend that they filed. They did not. Finally, Davis cannot have been harmed by any failure of the district court to focus on this claim as a separate claim, because this Court's scope of review is de novo, we have focused on it as a separate claim, and we have dealt with it accordingly.

evidentiary hearing indicated that he would have done it differently, but he conceded that this decision of Tassone's was based upon a legitimate tactical consideration. H.Tr. at 260. Moreover, as the district court pointed out, bringing to the jury's attention the fact that a prosecution witness had been hypnotized would have run the risk of bolstering that witness' testimony in the eyes of the jury. *See* 853 F.Supp. at 1528. We reached the same conclusion in *Spaziano,* holding that counsel's strategic decision not to attempt to impeach a witness on grounds that the witness had been hypnotized was a reasonable one. *See* 36 F.3d at 1039-41. That holding applies here.

## C. THE GUILT STAGE CLOSING ARGUMENT CLAIMS

Davis claims that in closing argument at the guilt stage the prosecutor improperly commented on his silence, referred to non-record evidence, misrepresented the testimony of prosecution witnesses and the argument of defense counsel, vouched for the credibility of witnesses, and stated the prosecutor's personal opinion. These contentions were thoroughly considered and discussed by the district court, *see* 853 F.Supp. at 1557-65, and we agree with its conclusion that Davis is not entitled to habeas relief based on them. To the extent Davis contends his trial counsel was ineffective for failing to object to various prosecutorial comments and arguments, that claim, too, is without merit.

## II. THE SENTENCE STAGE ISSUES

### A. THE AGGRAVATING CIRCUMSTANCES JURY INSTRUCTIONS CLAIM

In imposing death sentences upon Davis for each of the three counts for which he was convicted, the trial court found that five statutory aggravating circumstances were applicable to all three murder counts, and that one additional aggravating circumstance was applicable to the murder count involving the youngest victim. *See* 461 So.2d at 71. On direct appeal, the Court upheld the applicability of the five statutory aggravating circumstances for all three murders, but held that the sixth one, which had been found only in the case of the youngest victim's murder, was not applicable. *See id.* at 72. The Florida Supreme Court nonetheless affirmed Davis' death sentences,

8

because "[s]triking one of the aggravating circumstances leaves five valid ones for each count, with nothing in mitigation." *Id.*

Davis claims that the jury instructions given on three of the five statutory aggravating circumstances that were applied in his case were deficient, thereby rendering those three vague and overbroad in this case. The three aggravators Davis attacks on these grounds are: the especially heinous, atrocious or cruel circumstance; the cold, calculated, and premeditated circumstance; and the during the course of a felony circumstance.

The district court held that this claim was procedurally barred, *see* 853 F.Supp. at 1583-84, and the parties sharply disagree about the correctness of that holding. However, we need not reach the hotly disputed procedural bar issue, because as Davis effectively concedes, relief on this aggravating circumstance jury instruction claim is due to be denied on other grounds. Involving as it does alleged error occurring at only the advisory jury sentencing stage, this claim is dependent upon retroactive application of *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). We held in *Glock v. Singletary,* 65 F.3d 878, 890 (11th Cir.1995) (en banc), that retroactive application of the *Espinosa* decision is barred by the *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) doctrine. Therefore, as Davis conceded at oral argument, the *Glock* decision forecloses this claim regardless of whether the claim is procedurally defaulted or has merit. Since oral argument the Supreme Court has reached the same conclusion that we did in *Glock,* holding in *Lambrix v. Singletary,* --- U.S. ----, ---- - ----, 117 S.Ct. 1517, 1524-31, 137 L.Ed.2d 771 (1997), that *Espinosa* announced a new rule of law that does not fit within either of the two exceptions to the *Teague* doctrine.[3]

We are, of course, aware of the Supreme Court's admonition in *Lambrix* that the question of whether a claim is procedurally barred "ordinarily" should be decided before any *Teague* issues relating to that claim are addressed. However, the Supreme Court qualified that admonition, making

---

[3]We withheld our decision in this appeal pending two decisions. *Lambrix* was one of them, and *Lindh v. Murphy,* --- U.S. ----, 117 S.Ct. 2059, --- L.Ed.2d ---- (1997), was the other.

9

it something in the nature of a presumption instead of an invariable rule. The Court acknowledged that "[j]udicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law." --- U.S. at ----, 117 S.Ct. at 1523. That is the situation we have. The *Teague* issue could not be more easily resolvable against Davis, because the Supreme Court decided precisely the same issue against habeas petitioners in *Lambrix* itself. Given that, and the fact that the procedural bar issues relating to this particular claim are somewhat complicated, judicial economy dictates that we rest our decision about the *Espinosa* claim on the *Teague* doctrine, just as the Supreme Court did in its *Lambrix* decision. We do so, holding that Davis' aggravating circumstances jury instruction claim is *Teague* barred.

## B. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM RELATING TO MITIGATING CIRCUMSTANCES

Davis claims that his trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present mitigating circumstances relating to Davis' mental and emotional health, and his social-history. The district court held an evidentiary hearing on this claim, made detailed factfindings concerning it, and denied the claim. *See* 853 F.Supp. at 1529-36. We affirm the denial of relief on this claim for the reasons discussed at length in the district court's opinion; we make only one correction.

Our one correction involves one part of one sentence of the district court's opinion. In discussing counsel's decision to limit the amount of background evidence presented, the court referred to "background information which counsel would reasonably want to preclude the jury from hearing," and it gave as examples "incidents of pedophilia, prior arrests and convictions." *Id.* at 1535. However, as the district court's opinion itself points out on the page before the one containing that statement, during cross-examination of two of the sentence stage witnesses whom counsel did present, "the prosecutor was able to bring out the fact that Petitioner previously had been convicted for armed robbery and twice for involuntary manslaughter." *Id.* at 1534. It remains true, however, that counsel was able to keep from the jury any mention of Davis' acts of child molestation.

10

Davis acknowledges that preventing the jury from learning about his acts of child molestation "does reflect a strategic concern," Appellant's Br. at 43, but he argues that it was not a reasonable one. However, his own expert witness at the evidentiary hearing, Robert Link, disagreed. Although attorney Link testified that he personally would have put in mitigating background evidence at the risk of the jury learning about Davis' child molestation activities, he also testified that lawyers could reasonably disagree about that strategic choice. *See id.* at 1527. Link was right, attorneys could reasonably disagree over the matter. Neither strategic choice is outside the wide range of reasonable professional assistance. *See, e.g., Waters v. Thomas,* 46 F.3d 1506, 1511-12 (11th Cir.1995).

## C. THE CLAIM THAT THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE COLD, CALCULATED AND PREMEDITATED AGGRAVATING CIRCUMSTANCE

Davis claims that the sentencing court's reliance upon the "cold, calculated and premeditated" aggravating circumstance violated the Eighth Amendment, because no rational factfinder could find the elements of that circumstance to have been proven beyond a reasonable doubt. The State persuaded the district court that this claim was procedurally barred from federal habeas review, *see* 853 F.Supp. at 1583-84, but it has not persuaded us of that.

On direct appeal, the Florida Supreme Court addressed, apparently sua sponte, the issue of whether there was sufficient evidence in the record to support the five aggravating circumstances the trial court had found. *See* 461 So.2d at 71-72. It held that the evidence was sufficient to support all of the aggravating circumstance findings, except for one: the one about the murder having been committed to avoid or prevent an arrest. The Florida Supreme Court specifically held that the evidence Davis entered the victim's home armed with a pistol and rope, which he used to bind one of the victims, was "sufficient to support the court's finding of cold, calculated and premeditated in aggravation." *Id.* at 72. That is a ruling on the merits of the issue.

It is true, as the district court pointed out, that the state collateral court subsequently held in Davis' second Rule 3.850 motion proceeding that this same claim was "time barred and as a procedurally barred claim that should have, if preserved, been raised on direct appeal," 853 F.Supp.

11

at 1584. The district court also noted, *see id.,* that the Florida Supreme Court affirmed that procedural default holding when Davis appealed from the denial of his second Rule 3.850 motion, *see Davis v. State,* 589 So.2d 896, 898 (Fla.1991).

The point remains, however, that the Florida Supreme Court squarely addressed and rejected the merits of this aggravating circumstance claim on direct appeal. It did so even though Davis apparently did not raise the issue at trial or on appeal. The State does not contend that in order to preserve a claim already rejected on the merits by the Florida Supreme Court, a defendant is required to raise the claim again in a state collateral proceeding. Florida law does not require that.

It is settled that once the state courts have ignored any procedural bar and rejected a claim on the merits—not in the alternative but as the only basis of decision—that claim is not barred from federal habeas review. *See, e.g., Remeta v. Singletary,* 85 F.3d 513, 516 (11th Cir.1996) ("the *Sykes* procedural default rule does not preclude federal habeas review of a petitioner's constitutional claim if the state court adjudicates the federal claim on the merits"); *Alderman v. Zant,* 22 F.3d 1541, 1549 (11th Cir.1994) ("should a state court reach the merits of a claim notwithstanding a procedural default, the federal habeas court is not precluded from considering the merits of the claim"); *Mann v. Dugger,* 844 F.2d 1446, 1448 n. 4 (11th Cir.1988) (en banc) ("Since the Supreme Court of Florida therefore chose not to enforce its own procedural default rule, federal habeas review of the claim is not barred."). Once a state supreme court on direct review has eschewed a procedural default bar and based its disposition solely on a rejection of the merits of a claim, no amount of procedural bar holdings as to that claim in future proceedings will suffice to bar the claim from federal habeas review.[4]

Turning now to the merits of this claim, we hold it has none. In sentencing Davis to death, the trial court made these findings of fact:

---

[4]We do not mean to imply that subsequent state court pronouncements concerning an issue may not be considered in order to clarify the true nature of an earlier ambiguous holding about that issue, but here the Florida Supreme Court's holding on direct appeal was not of an ambiguous nature. It was an unvarnished holding on the merits.

The Defendant killed three innocent people in the sanctity of their home. He took the life of Nancy Weiler by beating her about the head and neck with a pistol and with such frequency and force as to break not only the trigger guard but to break the wooden grip and metal frame of the handle. Her skull was crushed in several places and the skin of her face and head was broken and bruised almost beyond recognition. Any one of most of the approximately 25 blows would have been sufficient to kill. The Defendant beat Nancy Weiler in an atrocious, cruel and brutal manner and continued to do so even after she must have lost consciousness.

The Defendant took the wrists of Kristina Weiler and bound them with rope behind her back. As she lay on the bed he fired a bullet into her chest. While helpless, bound and wounded and kneeling before him, the Defendant shot her in the head at point blank range and thus took her life from her.

The Defendant shot Katherine Weiler in her back as she tried to escape the same brutality she must have seen the Defendant inflict on her sister and mother. After she was dead he beat her with sufficient force to crush her skull.

No one will ever know, with certainty, the order of the death of Nancy, Kristy or Kathy. Nor will we ever know the total extent of the pain and terror they experienced. Yet the aftermath of the Defendant's work leaves no doubt that the greatest pain and the starkest terror were suffered by them in their dying.

Added to the actual physical pain they each experienced was the horror the second and third to die experienced in seeing the others so brutally abused.

....

Homicide is the killing of one human being by the act, procurement or commission of another. The Defendant killed each victim in this case. Prior to doing so he formed a conscious intent to kill if he were thwarted or found out in his act of burglary. This intent was evidenced by taking his father's pistol and some rope with him as he entered the Weiler home. In a cold and calculated and premeditated manner as to what to do under any circumstance he prepared to do exactly what he did—murder. There is or was no pretense of moral or legal justification as to any of the deaths he caused.

Those findings of fact are all supported by the evidence and provide ample basis for finding that the homicide was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

D. THE CLAIM CONCERNING THE FLORIDA SUPREME COURT'S PURPORTED FAILURE TO CONDUCT A HARMLESS ERROR ANALYSIS AFTER STRIKING ONE OF THE FIVE AGGRAVATING CIRCUMSTANCES

The Florida Supreme Court held that one of the five aggravating circumstances the trial court found—that the homicide was committed for the purpose of avoiding or preventing a lawful arrest—was not applicable, because the evidence failed to meet the legal standard for that

13

circumstance. *See* 461 So.2d at 72. The court cited for that holding its prior decisions in *Riley v. State,* 366 So.2d 19 (Fla.1978), and *Menendez v. State,* 368 So.2d 1278 (Fla.1979). Those decisions held that "the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement official," *Riley,* 366 So.2d at 22, "unless it is clearly shown that the dominant or only motive for the murder was the elimination of witnesses," *Menendez,* 368 So.2d at 1282.

Davis, of course, has no quarrel with the holding that it was error to find the aggravating circumstance in this case, but he does complain about what the Florida Supreme Court did, or failed to do, about the error. Instead of vacating and remanding for further sentence proceedings in the trial court, the Florida Supreme Court affirmed the sentence with this explanation: "Striking one of the aggravating circumstances leaves five valid ones for each count, with nothing in mitigation. We therefore affirm both the convictions and the sentence of death." 461 So.2d at 72.

Davis claims that action by the Florida Supreme Court entitles him to habeas relief from his sentence under a combination of *Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992); *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), and *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The district court did not address the merits of this claim, but instead held that the claim was procedurally barred. *See* 853 F.Supp. at 1582-83. Davis contests that holding, even though he does not deny that he failed to raise this specific issue in his rehearing petition to the Florida Supreme Court or in any of the state collateral pleadings he filed. Davis puts forward two reasons why his failure to raise this issue at any time in state court should not bar it from habeas review.

First, Davis contends that the Florida Supreme Court addressed this issue on direct appeal, and for that reason would not have entertained it again thereafter. The fatal flaw in that reasoning is that it confuses the basis for the claim (the Florida Supreme Court's treatment of the erroneous aggravating circumstance) with the claim itself (that the court's treatment violated the Constitution). *See* 853 F.Supp. at 1582. Davis never suggested to the Florida Supreme Court or any other state

14

court that it was error to affirm his death sentence after one of the aggravating circumstances was found to be unsupported by the evidence. Putting aside the fact that Davis failed to raise the claim in his rehearing petition to the Florida Supreme Court, the district court was correct that he could have raised the claim at least in his first state collateral proceeding. *See id.* at 1583.

The second argument Davis makes against application of the procedural bar in this case is based on *Clemons* and *Sochor.* He characterizes those two decisions as not imposing a requirement that "capital petitioners" present state courts with what he calls "another challenge to the state supreme court's actions" underlying this type of claim. There are two problems with that contention. The first problem is that both decisions were rendered on direct appeal, and it is not readily apparent that the independent-and-adequate state law ground doctrine that confines the Supreme Court's jurisdiction in direct appeals from state supreme courts is coterminous with the procedural default doctrine that limits federal habeas corpus review. The second problem with Davis' contention is that we are unconvinced either *Clemons* or *Sochor* stand for the proposition that even on direct review there is no necessity for raising in the state supreme court any errors in that court's treatment of an erroneous aggravating circumstance. Neither of those two decisions held that. Neither of them focused on whether a defendant must argue in the state supreme court that its own action in response to an unsupported aggravating circumstance was error before that issue can be raised in federal court. We do not even know that the defendants in *Clemons* and *Sochor* failed to preserve the issue in the state supreme courts. In view of these circumstances, we will not infer from the direct appeal decisions in *Clemons* and *Sochor* a rule of law applicable to federal habeas review, especially not a rule contrary to what we understand procedural default law to be.

### E. THE SENTENCE STAGE PROSECUTORIAL ARGUMENT CLAIM

The district court thoroughly discussed and rejected Davis' claim that the prosecutor's closing argument at the sentence hearing violated the Eighth and Fourteenth Amendments, and that his counsel's failure to object more extensively to that argument violated the Sixth Amendment. *See*

853 F.Supp. at 1569-74. We affirm the district court's holdings on these issues for the reasons set out in its opinion.

## F. THE *CALDWELL V. MISSISSIPPI* CLAIM

Davis contends that prosecutorial comments coupled with judicial comments and jury instructions combined to diminish the jury's sense of responsibility in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The district court held that this claim is not procedurally barred, 853 F.Supp. at 1555, a holding the State does not contest before us. Turning to the merits, the district court discussed the relevant law and facts at some length before rejecting the claim. *See id.* at 1555-57.

Instead of supplanting the district court's explanation of why Davis' *Caldwell* claim fails, we will supplement it. We begin with the applicable law. As the district court pointed out, two key decisions setting out *Caldwell* law are en banc decisions of this Court issued on the same day in *Mann v. Dugger,* 844 F.2d 1446 (11th Cir.1988) (en banc), and *Harich v. Dugger,* 844 F.2d 1464 (11th Cir.1988) (en banc). The district court reasoned that the facts of the present case made it more like *Harich,* a case in which the claim was rejected, than it was like *Mann,* a case in which the claim was held to have merit. *See* 853 F.Supp. at 1557.

We agree with that conclusion and would add to the legal analysis only an observation about how the law relating to *Caldwell* claims has developed since *Mann* and *Harich.* In both of those en banc decisions the Court at least implied that a prosecutorial or judicial comment or instruction could constitute *Caldwell* error even if it was a technically accurate description under state law of the jury's actual role in capital sentencing. *See Mann,* 844 F.2d at 1457; *Harich,* 844 F.2d at 1475 (plurality opinion).[5] Those implications cannot survive the Supreme Court's subsequent holdings

---

[5] Judge Tjoflat's opinion in *Harich* describes him as "specially concurring," and refers to Judge Fay's opinion as "the majority." *See* 844 F.2d at 1475. However, as to the *Caldwell* issue, Judge Tjoflat's opinion was joined by four other judges (Kravitch, Hatchett, Anderson, and Clark), whereas Judge Fay's opinion was joined by only three other judges (Roney, Hill, and Edmondson). There were two dissents on that issue (Vance and Johnson). Therefore, the split was 5-4-2, and Judge Tjoflat's opinion was the plurality opinion of the en banc court on the *Caldwell* issue.

that in order "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law," *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (quoting *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989)). "The infirmity identified in *Caldwell* is simply absent" in a case where "the jury was not affirmatively misled regarding its role in the sentencing process." *Romano,* 512 U.S. at 9, 114 S.Ct. at 2010.

To the extent of any inconsistency between our *Mann /Harich* pronouncements and the Supreme's supervening ones, of course, we are required to heed those of the Supreme Court. *See, e.g., Cottrell v. Caldwell,* 85 F.3d 1480, 1485 (11th Cir.1996); *Leach v. Pan American World Airways,* 842 F.2d 285, 286 (11th Cir.1988). Thus, it is clear that the references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell.* Those references and descriptions are not error, because they accurately characterize the jury's and judge's sentencing roles under Florida law.

There were remarks made during the course of the trial that considered in isolation would cause concern about whether the jury's sense of its actual responsibility in the sentencing process under Florida law might have been diminished. *See* 853 F.Supp. at 1556-57. Our decisions, however, teach that such remarks must be considered in the context of the entire trial. We emphasized that point in *Waters v. Thomas. See* 46 F.3d 1506, 1523-24 (11th Cir.1995) ("Whether [the] two statements viewed out of context might have undermined the jury's sense of responsibility is an issue we need not decide.") (en banc); *see also Harich,* 844 F.2d at 1475 (plurality opinion) ("[A] proper analysis of a *Caldwell* claim requires evaluation of how a reasonable juror would have understood the court's statements in the context of the entire trial.").

The district court set out many of the relevant facts concerning this issue. *See* 853 F.Supp. at 1556-57. We add some others drawn from the voir dire process. During voir dire, the venire persons were death-qualified, *see Witherspoon v. Witt,* 391 U.S. 510, 517, 88 S.Ct. 1770, 1774, 20

17

L.Ed.2d 776 (1968), and the questions they were asked for that purpose brought home to them the importance of the jury's role in sentencing. For example, this colloquy occurred between the prosecutor and a venire member:

> [PROSECUTOR]: And if you went back in there and in the advisory phase and you were convinced under that law and the fact that an appropriate sentence would be death, would you recommend it? Could you recommend it?

> [PROSPECTIVE JUROR]: Didn't you say, though, that the Judge would decide what the penalty was not I?

> [PROSECUTOR]: Yes, and I am glad you brought that up. It's a two-phase but the fact that it's merely a recommendation from the jury, please don't think that that's unimportant; it is very important. The recommendation from the jury for or against the death penalty, the law won't require you to do something that is a nullity, it's important but it's not binding on the Judge. The Judge makes the final decision of life or death if there is a conviction; do you understand that?

> [PROSPECTIVE JUROR]: Uh-huh.

> [PROSECUTOR]: So, it's still a very somber responsibility that you have to make a recommendation. Now, my question is: Could you recommend death if you believed it was appropriate under the facts of the law?

> [PROSPECTIVE JUROR]: If I feel that he is guilty, I'd vote guilty or not guilty, I can do that regardless of the consequences.

> [PROSECUTOR]: And if you believed that he deserved the electric chair under the facts, you would vote for the electric chair?

> [PROSPECTIVE JUROR]: Well, I don't put it that way.

> [PROSECUTOR]: Well, that is the way I have to put it. I know it's hard question and I don't want you to think I am brow beating you but they are hard questions because it's a serious difficult problem but the question is: could you vote for death?

> [PROSPECTIVE JUROR]: Right at this point before I know whether he is guilty or not?

> [PROSECUTOR]: No. I am not asking you to make up your mind now; I am not asking you to make up your mind now whether he is guilty; I am not asking you to make up your mind if you would vote death. I am asking you if the facts and if the law indicate that death would be the appropriate penalty, could you then vote for death?

> [PROSPECTIVE JUROR]: I guess so. I don't know; I don't really know. I will put it that way. I don't really know that that's fair. Maybe after it's all over.

> [PROSECUTOR]: But have you an open mind about it?

> [PROSPECTIVE JUROR]: Yes.

18

Tr. 588-90.  Not only did that particular venire person become a member of the jury, but this colloquy, like others we will quote, occurred in the presence of the other venire members.  Tr. 535, 543-44, 670-71.

Throughout the voir dire process, the prospective jurors were asked if they "could recommend death in the appropriate case," "recommend the death penalty if the facts and the law indicate that the death sentence would be the appropriate sentence," "follow the law and the evidence in [the case] and recommend death," or "recommend that a man be sentenced to death by electrocution," and so forth.  Tr. 591-97, 693-700, 745, 748-49, 781.  When asked if she could vote for death, if the facts justified it, one prospective juror responded as follows:

> [PROSPECTIVE JUROR]:  That is a hard question.
>
> [PROSECUTOR]:  It's not intended to be easy.  It is hard.  It's hard to ask and hard to answer because it's an unpleasant subject but could you vote to recommend death if the facts and the law convince you that it is justified and authorized under the law, could you vote to sentence a man to the electric chair or recommend that?
>
> [PROSPECTIVE JUROR]:  I don't think so.

Tr. 592-93.  When another prospective juror indicated some opposition to the death penalty, this exchange occurred:

> [PROSECUTOR]:  If the facts and the law, and Judge Harding kindly interceded a minute ago and pointed out that he will read you, tell you the law of the death penalty phase, if we get to it; if this defendant is convicted, he will tell you what the law is and he will tell you basically that there are eight or nine aggravating circumstances as a matter of law that you are to consider if they are present and only you can decide whether they are present, and mitigating factors that are present and you weigh those and decide if the aggravating factors outweigh the mitigating factors, and the question is:  could you follow that law and could you vote death if you were convinced under the appropriate law and evidence that it was appropriate under the law and the facts?
>
> [PROSPECTIVE JUROR]:  It's a somber responsibility but, under the law, I think I could.
>
> [PROSECUTOR]:  We all feel that way.  Could you do that?
>
> [PROSPECTIVE JUROR]:  Yes.

Tr. 596.

19

Later, another prosecutor asked some other prospective jurors, who had been put in the jury box in order to finish out the selection process, about their views on the death penalty. His questioning included this:

> [PROSECUTOR]: Okay. Now, assuming you did, in fact, find an individual guilty of first degree murder and then you had to sit through what we call the penalty phase and evidence was presented to you and the Court charged you as to what the law was and the facts and the law both indicated that death would be the appropriate sentence, could you come back out here and could you say that this defendant, Judge Harding, should be put to death, could you do that under the appropriate circumstances?

Tr. 698. Most said yes, but some said no. Tr. 698-700, 737-38, 741-43.

When an additional group of the venire members were put into the jury box to be questioned, some expressed their opposition to the death penalty and were questioned about how that would affect them as jurors. While addressing the group, the prosecutor gave this explanation to the group and further questioned one venire person who had earlier indicated some reluctance about whether she could ever vote for a death sentence:

> [PROSECUTOR]: Back to that awful subject that you have heard so much about which we must talk about; namely, death, the death penalty.
>
> ....
>
> We told you before that the case goes along and it's a two-part trial providing a bifurcated trial and if there is a conviction of first degree murder of any one of the three counts of first degree murder, then there will be a second phase and that second phase would be solely for the purpose of getting a recommendation from the jury for either life or death. The only reason you have for the second phase.
>
> Now, [prospective juror], that is important. We say that it is only advisory but, as I told the jury earlier and told you all earlier this morning, that doesn't mean that it isn't important and the law as to what that recommendation is is very somber, very important and very significant.
>
> Knowing that your recommendation could be the vote that might cause the defendant to die in the electric chair, do you believe under the law and the evidence that the death penalty was justified under the law and the evidence, could you cast a vote to put him in the electric chair and recommend that he die by electrocution?

Tr. 740-41. Of one venire person, the prosecutor followed up:

> [PROSECUTOR]: You wouldn't under any circumstances, you would not be able to vote the determination that that defendant die in the electric chair, no matter what the evidence showed in the advisory stage, is that correct?

20

[PROSPECTIVE JUROR]:  Yes.

Tr. 742.

All of the jurors went through the death-qualification process during voir dire, and it is one part of the context in which other statements and descriptions of the jury's role in the death sentencing process must be considered.  We have considered not just these but all of the statements, remarks, and instructions about their sentencing role that the jurors heard from the beginning of the trial until the sentence verdict was returned, and we have considered them in the context of the entire trial process.  Having done so, we agree with the district court that the jury's sense of responsibility for its advisory sentence recommendation was not undermined;  there was no *Caldwell* violation. *See* 853 F.Supp. at 1556-57.

### III. THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM

Davis claims that his counsel rendered ineffective assistance on appeal by failing to raise in the Florida Supreme Court certain issues relating to his death sentence.  After studying the briefs and the part of the record relating to this issue, we are in agreement with the district court's discussion about it, *see* 853 F.Supp. at 1548-51, and conclude that Davis' contentions are without merit.

### IV. CONCLUSION

The district court's judgment denying the petition for a writ of habeas corpus is AFFIRMED.